# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:20-CV-312

| | |
|---|---|
| CLEAR BLUE INSURANCE COMPANY, | )<br>)<br>) |
|        Plaintiff, | ) |
| v. | )   **VERIFIED COMPLAINT** |
| AMIGO MGA, LLC, | )<br>)<br>) |
|        Defendant. | ) |

Plaintiff, for its Verified Complaint against Defendant, alleges and says as follows:

1. Clear Blue Insurance Company ("Clear Blue") is an insurance company that entered into an agreement with Amigo MGA, LLC ("Amigo"), an insurance agency, to issue policies on Clear Blue's behalf to individuals in several states. A true and correct copy of the Amended and Restated General Agency Agreement ("Agreement") is attached as **Exhibit 1** and is incorporated by reference as if fully set forth herein.

2. The Agreement and state law governing Amigo's insurance business explicitly provides that Amigo is Clear Blue's fiduciary.

3. As the agent and fiduciary, Amigo is charged with selling policies, collecting premiums from policyholders, placing the premiums in Clear Blue trust accounts, and remitting the entrusted premiums at Clear Blue's direction.

4. State law also requires insurance agents, such as Amigo, to properly remit premiums.

5. Remitting premiums is essential for Clear Blue (as with any insurance company), since it needs premiums to pay insured claims, such as to car accident victims.

6. Amigo is improperly withholding and misappropriating the premiums, rather than remitting the premiums to Clear Blue for the purpose of paying insured claims.

7. By refusing to remit at least $2.8 million in policyholder-paid premiums, Amigo has breached and continues to breach its fiduciary and contractual duties, and it has violated fundamental insurance laws.

8. Properly remitting premiums is essential to protect claimants and the integrity of the insurance system.

9. As the insurance agency, Amigo has no right whatsoever—in law or contract—to hold the premiums at its own discretion.

10. For the past year, Clear Blue has demanded that Amigo remit overdue and quickly accumulating premiums, while Amigo has given several pretextual excuses for the delay.

11. Alan Rasof (Amigo's CEO) has recently admitted to commingling the premiums with other insurance accounts, falsely claiming Amigo needed to commingle to facilitate the processing of claims.

12. Clear Blue, however, had specifically instructed Amigo to remit the premiums for Clear Blue to process the claims.

13. Most recently, Clear Blue discovered that Amigo has diverted premiums to its own bank account—a blatant violation of law and the Agreement (similar to a law firm using client trust funds for the firm's own purposes).

14. Specifically, Amigo executed five transfers of premium trust funds to its own bank account totaling $413,000, and it has failed to respond to all seven separate correspondences sent to its CEO, CFO, and Amigo's attorney specifically asking why those transfers were made.

15. Amigos' acts reveal its bad faith and its intent to embezzle and convert the premiums.

16. Injunctive relief, including a temporary restraining order ("TRO") and preliminary injunction ("PI"), are needed immediately to protect the entrusted premiums—which are used to pay insured claims—from rapid dissipation by Amigo. A permanent injunction is also necessary to protect against irreparable harm.

17. Clear Blue's claims meet all four elements for a TRO and PI, as well as for a permanent injunction.

18. First, Clear Blue's claims for breach of contract and fiduciary duty, among others, are meritorious and would return the parties to the last uncontested status preceding the controversy.

19. Second, Amigo's continued failure to remit the entrusted premiums *and* its flagrant willingness to divert the premiums to its own bank account will cause irreparable harm to Clear Blue absent a TRO and PI, as Amigo otherwise will be unable to pay a future judgment and will dissipate or deplete the premiums.

20. Third, the harm to Clear Blue and insured claimants outweighs any limited, temporary hardship possibly imposed on Amigo.

21. Fourth, the public interest sides with enforcing contracts and with preventing the dissipation of illegally obtained assets, particularly of such a substantial sum.

## THE PARTIES

22. Clear Blue Insurance Company is an Illinois-domiciled insurance company with its U.S. headquarters in Charlotte, North Carolina, and has an "A-" (Excellent) rating from the leading insurance rating company, AM Best.

23. Clear Blue offers property and casualty insurance, including automobile insurance, and is licensed in 48 states and the District of Columbia.

24. Amigo MGA, LLC is an insurance agency domiciled in Illinois with its principal place of business in Hallandale Beach, Florida.

25. Upon information and belief, Amigo's members—Olympus Investment Partners, LLC and Rose Pearl, LLC—are organized in Wyoming and are citizens of Florida because (a) Alan Rasof (Amigo's CEO) is a citizen of Florida and (b) Mr. Rasof is the member of both Olympus Investment Partners, LLC and Rose Pearl, LLC.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over this matter because the parties are completely diverse and the amount in controversy exceeds $75,000.

27. As an LLC, Amigo's diversity turns on the citizenship of its members, and thus, Amigo's citizenship is in Florida.

28. Clear Blue, which is domiciled in Illinois, has its principal operations in Charlotte, North Carolina, and additional operations in Puerto Rico.

29. Venue is proper pursuant to 28 U.S.C § 1391 because the events giving rise to this complaint happened in this district.

## PERSONAL JURISDICTION

30. The Agreement's choice-of-law provision specifies North Carolina law and its choice-of-venue provision specifies North Carolina courts in Mecklenburg County. (Ex. 1, Agreement ¶¶ 11.1, 11.4, 12.12.) The Agreement is "deemed performable at [Clear Blue's] administrative office in Charlotte, North Carolina[.]" (*Id*. ¶ 11.4.)

31. Alan Rasof (Amigo's CEO) has traveled to North Carolina on multiple occasions to meet with Clear Blue employees, including in June 2018.

32. Mr. Rasof and Ron Finale (Amigo's CFO), who is a citizen of Georgia, regularly send emails and mail to Clear Blue employees located in North Carolina.

## FACTUAL ALLEGATIONS

33. On or about July 1, 2016, Clear Blue and Amigo entered into the Agreement (originally titled the General Agency Agreement), which was later amended as the Amended and Restated General Agency Agreement on or about July 15, 2018. (Ex. 1, Agreement.)

*Relevant Terms of the Agreement*

34. Under the Agreement, Clear Blue appointed Amigo as its "General Agent" for producing and underwriting automobile insurance. (*Id.* ¶ 1.1.)

35. Clear Blue specifically authorized Amigo to perform certain acts and duties as Clear Blue's agent, including accepting insurance applications, quoting and binding policies, providing policyholder communications, and collecting and remitting premiums due from policyholders to Clear Blue. (*Id.* ¶ 1.4.)

36. Clear Blue and Amigo expressly agreed that "all premiums collected by the General Agent are collected on behalf of [Clear Blue and] that such premiums are the property" of Clear Blue. (*Id.* ¶ 5.1.)

37. Amigo has a "fiduciary responsibility" to Clear Blue "with respect to such premiums and other accounts or funds held on [Clear Blue's] behalf." (*Id.* ¶ 5.1.)

38. In addition, "all premiums . . . shall be deposited into a premium trust account" and the "funds deposited therein . . . are understood to be owned solely by" Clear Blue. (*Id.*)

39. Each month, Amigo must remit "all premiums [to Clear Blue] upon all policies of insurance written through Amigo or any of its Producers," subject to a limited number of narrow exceptions. (*Id.* ¶¶ 5.5, 5.6, 5.7.)

40. Most importantly, Amigo could withdraw premiums only "at the direction of [Clear Blue] to establish, fund and maintain a separate claims account . . . [to] draw against to pay claims." (*Id.* ¶ 5.2.)

41. If any dispute arises between Amigo and Clear Blue regarding the premiums, Amigo must "remit immediately all money and property, without offset or deductions for commissions, to the trust account." (*Id.*)

42. In addition, Amigo also must keep Clear Blue advised of the bank where premium funds are deposited and to furnish Clear Blue with such information as Clear Blue may require, including, but not limited to, "the amount of deposit in any such account at any time, a list of recent checks drawn on any account containing the names of the payee and the amounts and any other bank information requested by" Clear Blue. (*Id.* ¶ 5.10.)

43. The Agreement provides that North Carolina law governs. (*Id.* ¶ 11.1.)

44. The Agreement mandates arbitration for the "resolution of damages" to occur in New York City. (*Id.* ¶ 12.1.)

45. The Agreement expressly provides that either party may seek "any interim, preliminary or injunctive relief that is necessary to protect the rights or property of that party, pending an arbitration award by the arbitrators." (*Id.* ¶ 12.12.)

46. The Agreement further provides that federal district court in North Carolina is appropriate and that the parties waive any related defenses or objections. (*Id.*)

*Termination of the Agreement*

47. In February 2019, Clear Blue terminated the Agreement following several breaches by Amigo. A true and correct copy of the February 15, 2019, Notice of Termination Letter is attached as **Exhibit 2** and is incorporated by reference as if fully set forth herein.

48. Amigo accepted the termination but requested a short-term extension. A true and correct copy of the February 19, 2019, Forbearance Agreement is attached as **Exhibit 3** and is incorporated by reference as if fully set forth herein.

49. Clear Blue and Amigo then entered a "wind down" or "runoff" period with respect to the existing insurance policies, during which period Amigo remained liable for collecting premiums from policyholders of existing policies, placing the premiums in Clear Blue trust accounts, and then remitting them to Clear Blue. (Ex. 1, Agreement ¶ 5.1.)

*Amigo's Continued Failure to Remit the Entrusted Premiums*

50. In March 2019 (one month into the runoff period), Amigo failed to remit premiums collected from policyholders to Clear Blue. A true and correct copy of Email Correspondence between Ash Noronha (Clear Blue) and Michael Dorrance (Amigo's partner agency, Cencal Insurance Services, Inc.) dated March 7, 2019, is attached as **Exhibit 4** and is incorporated by reference as if fully set forth herein.

51. Explaining the cause for delay, Michael Dorrance confessed that Amigo had been "forced to pay RFIB claims" with the premiums. (*Id.*)

52. "RFIB" is a reinsurance broker that collects a portion of the insurance premiums and passes them through to the reinsurers that acquire part of the risk associated with Clear Blue policies.

53. Mr. Noronha again instructed Amigo to remit the premiums to Clear Blue, so that Clear Blue could handle the paying of claims. (*Id.*)

54. Amigo's failure to remit the overdue and quickly accumulating premiums continued through 2019. Meanwhile, Clear Blue had been working to reach a fair commercial resolution with Amigo concerning its failures, rather than resort to contentious and drawn-out litigation.

55. On June 18, 2019, Clear Blue notified Amigo that it owed $871,287.84 in "extremely overdue" premiums. A true and correct copy of the June 18, 2019, Demand Letter is attached as **Exhibit 5** and is incorporated by reference as if fully set forth herein.

56. Alan Rasof (Amigo's CEO) replied that Amigo was "doing a reconciliation" and needed more time. (*Id.*)

57. By August 28, 2019, when the overdue premiums approached $1.7 million, Ron Finale (Amigo's CFO) stated that Amigo was still "working through a full reconciliation" and requested "patience." A true and correct copy of Email Correspondence between Mr. Finale and Mr. Noronha dated August 28, 2019, is attached as **Exhibit 6** and is incorporated by reference as if fully set forth herein.

58. In September 2019, Mr. Finale told Clear Blue that Amigo had begun a "forensic audit" that would further delay the remittance of premiums.

*Amigo Obstructed Access to Amigo's Bank Accounts*

59. On October 31, 2019, Clear Blue notified Amigo of its plans to audit Amigo's books and records. A true and correct copy of the October 31, 2019, Notice of Audit Letter is attached as **Exhibit 7** and is incorporated by reference as if fully set forth herein.

60. The Agreement authorizes Clear Blue to perform an audit "relating to business transacted pursuant to this Agreement[,]" and the right "survive[s] termination of this Agreement." [Ex. 1, Agreement ¶ 8.3].

61. During the audit, Mr. Rasof (Amigo's CEO) refused to grant access to Amigo's bank account. A true and correct copy of the Audit Report is attached as **Exhibit 8** and is incorporated by reference as if fully set forth herein.

62. On February 14, 2020, Clear Blue—which was continuing to work to resolve the failures of Amigo through fair and reasonable commercial means—served a demand on Amigo for records related to Amigo's bank account. A true and correct copy of the February 14, 2020, Demand to Provide Bank Account Documentation Letter is attached as **Exhibit 9** and is incorporated by reference as if fully set forth herein.

63. On February 24, 2020, Keith Grumer (Amigo's counsel) assured Clear Blue that "Amigo has not mishandled any funds, nor has it misapplied any payments" and that "Amigo remains committed to completing its reconciliation." A true and correct copy of Email Correspondence between Mr. Grumer and Mr. Kennedy dated February 24, 2020, is attached as **Exhibit 10** and is incorporated by reference as if fully set forth herein.

64. Four days later, however, Mr. Rasof admitted to commingling Clear Blue's premiums, alleging that Amigo was commingling to facilitate the processing of claims. A true and correct copy of Email Correspondence between Mr. Rasof and Peter Klope dated February 28, 2020, is attached as **Exhibit 11** and is incorporated by reference as if fully set forth herein.

65. Mr. Rasof wrote that "Clear Blue instructed Amigo . . . to use their premium funds to go settle RFIB claims . . . ." (*Id.*)

9

Case 3:20-cv-00312-GCM   Document 1   Filed 06/03/20   Page 9 of 20

66. Neither Mr. Rasof nor anyone else at Amigo has provided any support to show they had, in fact, used "their premium funds to go settle RFIB claims." (*Id.*)

67. Clear Blue had clearly communicated to Amigo that Clear Blue was handling all claims and that Amigo must remit the premiums directly to Clear Blue. (Ex. 4.)

68. On March 12, 2020, Clear Blue notified Amigo of its several breaches and Clear Blue's intent to enforce its rights in the appropriate forum. The breaches included, among others, Amigo's "failure to remit premium funds" for more than one year and "commingling" of the funds. (*Id.*) A true and correct copy of the March 12, 2020, Notice and Demand Letter is attached as **Exhibit 12** and is incorporated by reference as if fully set forth herein.

69. Amigo has already failed to comply the Agreement's arbitration provision to select an abritrator within the alotted period. (Ex. 1, Agreement ¶¶ 12.2, 12.3.)

70. On April 21, 2020, Clear Blue filed a formal complaint with the insurance regulator in Florida where Amigo is headquartered. Clear Blue then filed an amended complaint on April 23, 2020. On May 22, 2020, Clear Blue filed a similar complaint with the insurance regulator in Illinois where Amigo is domiciled.

*Amigo Began Diverting Premiums from the Clear Blue Trust Accounts to Amigo's Own Bank Account*

71. On (or about) April 23, 2020, Clear Blue confirmed that Amigo diverted $413,000 from the Clear Blue trust accounts to Amigo's own bank account. A true and correct copy of Email Correspondence between Daniel Kennedy, Mr. Finale, and Mr. Rasof dated April 23, 2020, is attached as **Exhibit 13** and is incorporated by reference as if fully set forth herein.

72. Four of the transfers (totaling $262,000) occurred in mid- to late-March 2020—just days after Clear Blue notified Amigo of its intent to enforce its rights to recoup the premiums. True and correct copies of the February and March Bank Account Statements, with the

unauthorized transactions highlighted, are attached as **Exhibits 14 and 15** and are incorporated by reference as if fully set forth herein.

73. Amigo's CEO, CFO, and its attorney have all failed to respond to Clear Blue's seven correspondences concerning the unauthorized transfers. Amigo's diversion of entrusted premiums to its own bank account—combined with the complete lack of communication from Amigo regarding the diversions—clearly demonstrated that Amigo was unwilling and uninterested in working in a commercially reasonable manner to resolve its failures to remit the premiums.

74. Upon information and belief, Amigo is actively dissipating at least $2.8 million of the premiums owed to Clear Blue, which Clear Blue needs to pay insured claims.

*Relevant State Laws & Public Policy*

75. Illinois law governs Amigo's insurance practices and provides that premiums "shall be held in a fiduciary capacity and shall not be misappropriated, converted, or improperly withheld." 215 ILCS 5/500-115(a).

76. Florida law similarly governs Amigo's insurance practices. It also prohibits agents from "divert[ing] or misappropriat[ing] the premium funds" and requires that agents "keep the funds belonging to each insurer . . . in a separate account so as to allow the department or office to properly audit such funds." Fla. Stat. § 626.561.

77. North Carolina law governs the Agreement (but does not regulate Amigo's day-to-day insurance business). North Carolina law prohibits insurance agents from "[i]mproperly withholding, misappropriating, or converting any monies or properties received in the course of doing insurance business." N.C. Gen. Stat. § 58-33-46.

78. In North Carolina, embezzlement or fraudulent use of funds—including premiums—by an insurance agent is a felony. N.C. Gen. Stat. § 58-2-162.

79. The primary purpose of North Carolina's insurance laws is "protection of the insuring public" and such laws are "of vital importance to the consumer." *State ex rel. Long v. Beacon Ins. Co.*, 87 N.C. App. 72, 77 (1987).

80. The states' regulatory schemes show the important public policy of protecting premiums for the sake of insured claimants and the integrity of the insurance system.

81. The diverting, misappropriating, and converting of policyholder-paid premiums—which are necessary to pay insured claims—poses irreparable harm to Clear Blue and a substantial threat to insured claimants.

*Defendant's Breaches of Fiduciary and Contractual Duties*

82. The Agreement is a valid and binding contract.

83. Amigo is a fiduciary of Clear Blue, including with respect to the managing and remitting of policyholder-paid premiums.

84. Amigo has breached its contractual and fiduciary duties for each of the following (but not limited to the following) acts or practices:

   a. Failing to remit the premiums to Clear Blue on a monthly basis, starting at least in March 2019;

   b. Obstructing Clear Blue's access to Amigo's bank account during Clear Blue's audit in December 2019;

   c. Commingling Clear Blue's premiums with other accounts, which Mr. Rasof admitted to doing on or about February 28, 2020; and

   d. Diverting $413,000 of premiums owned by Clear Blue to Amigo's own bank account between February and March 2020.

85. Amigo's actions injured Clear Blue—specifically, by causing the loss of at least $2.8 million in premiums, which are essential for paying insured claims.

*Irreparable Harm in the Absence of a TRO and PI*

86. Amigo, as the trustee of the wrongly withheld and misappropriated premiums, is positioned to move or dissipate the premiums absent a TRO and PI and ultimately a permanent injunction.

87. The fact that Amigo has diverted $413,000 of entrusted premiums to its own bank account demonstrates Amigo's intent to move or dissipate the premiums.

88. Upon information and belief, Amigo will be insolvent and will be unable to pay a future judgment.

89. Upon information and belief, Mr. Rasof will be insolvent.

90. Upon information and belief, Mr. Rasof could face criminal charges for the conduct related to this action, which likely would render him, and by extension Amigo, insolvent.

91. Upon information and belief, Mr. Rasof operates several shell companies that allow his companies to avoid legal liabilities by shuffling assets from one to the next.

92. For example, three of the companies he controlled—Esperanza Inc., International Gateway Insurance Brokers, Inc., and International Gateway Insurance Brokers Holdings, LLC—defended against nearly identical claims in another lawsuit. There, plaintiff-insurer, Axa Seguros, alleged that Mr. Rasof and his three companies engaged in a "fraudulent scheme to conceal the conversion and/or theft of premiums" totaling $1.2 million owed to the insurer. A true and correct copy of the complaint in the Axa Seguros action is attached as **Exhibit 16** and is incorporated by reference as if fully set forth herein.

93. Upon information and belief, in 2013, Mr. Rasof used another company, ATR Investments—Hollywood LLC, to borrow substantial sums from MB Financial Bank. Mr. Rasof and his company then breached their duties to repay the loan and a judgment was entered against them for $726,000.

13

Case 3:20-cv-00312-GCM   Document 1   Filed 06/03/20   Page 13 of 20

94. Upon information and belief, in 2011, another company belonging to Mr. Rasof—ATR Investments Western IO LLC—had a default judgment entered against it for failure to repay a $100,000 loan.

95. In 2015, an Illinois court entered a judgment against Mr. Rasof and <u>eighteen</u> of his companies (all similarly named) for $5,722,008.17. A true and correct copy of the judgment in the Associated Bank, N.A. action is attached as **Exhibit 17** and is incorporated by reference as if fully set forth herein.

96. The underlying conduct in the above-mentioned lawsuits and judgments reveal Amigo's intent, plan, and motive of Amigo and its CEO to dissipate of the entrusted premiums, and to avoid paying Amigo's obligations.

97. Amigo's misappropriation, conversion, and improper withholding of Clear Blue premiums also will irreparably harm Clear Blue's goodwill with its policyholders, reinsurers, and state insurance regulators, absent a TRO and PI and ultimately a permanent injunction.

*Other Factors*

98. Clear Blue (and by extension, its claimants) would incur substantial harm in the absence of a TRO and PI and ultimately a permanent injunction, while Amigo would face no hardship because it has no ownership claim to the entrusted premiums.

99. In addition, the public interest is in ensuring contracts are enforced and in avoiding the dissipation of illegally obtained assets.

100. The public interest also weighs heavily on protecting claimants and the functioning of the insurance market, as reflected in states' insurance regulatory schemes.

## FIRST CLAIM FOR RELIEF
### (Motion for Temporary Restraining Order and Preliminary Injunction)

101. Clear Blue repeats and realleges Paragraphs 1 through 100 above, which are incorporated by reference herein.

102. Amigo has committed several breaches of its fiduciary and contractual duties—and violated basic insurance law—by failing to remit at least $2.8 million in policyholder-paid premiums.

103. Amigo's intent—which was fully revealed when it diverted $413,000 of entrusted premiums to its own bank account—is to improperly use and dissipate at least $2.8 million in owed premiums.

104. Clear Blue is highly likely to succeed on the merits of its claims, including (but not limited to) Clear Blue's claims for breach of contract and breach of fiduciary duty, which Clear Blue is in the process of bringing in arbitration.

105. Clear Blue (and claimants) will suffer irreparable harm in the absence of a TRO and PI, including (but not limited to the fact) that Amigo (a) will become insolvent and will be unable to pay a future judgment and (b) will dissipate and divert the premiums at issue.

106. Clear Blue's harm outweighs any slight harm to Amigo if a TRO and PI is entered.

107. The public interest weighs in favors of enforcing the contract and preventing the dissipation of assets and thus ordering the requested relief.

108. The Agreement explicitly allows for the seeking of "any interim, preliminary or injunctive relief that is necessary to protect the rights or property of that party, pending an arbitration award by the arbitrators." (Ex. 1, Agreement ¶ 12.12.)

15

## SECOND CLAIM FOR RELIEF
**(Permanent Injunction)**

109. Clear Blue repeats and realleges Paragraphs 1 through 108 above, which are incorporated by reference herein.

110. Amigo's failure to remit—and conversion, misappropriation, and diversion of—at least $2.8 million in policyholder-paid premiums has irreparably injured Clear Blue.

111. The remedies available at law are inadequate to compensate for the irreparable injury, as Amigo will be unable to pay a final judgment and has dissipated the entrusted premiums.

112. The balance of hardships between the parties by granting the permanent injunction weighs heavily toward Clear Blue and is thus warranted.

113. The public interest would be served by ordering the permanent injunction.

114. The Agreement explicitly allows for the seeking of "any interim, preliminary or injunctive relief that is necessary to protect the rights or property of that party, pending an arbitration award by the arbitrators."

WHEREFORE, Clear Blue respectfully prays the Court for the following:

1. That the Court treat this Verified Complaint and the Exhibits attached to it as an Affidavit in support of Plaintiff Clear Blue's Motion for a Temporary Restraining Order and Preliminary Injunction;

2. That the Court enter a Temporary Restraining Order and Preliminary Injunction against Defendant Amigo, including any person or entity acting on behalf of or in concert with Defendant:

   a. Requiring Amigo to cause the transfer of all Clear Blue-owned premiums—totaling at least $2.8 million—held in all bank accounts in the care, custody,

16

or control of Amigo, its officers, or any of its agents to Clear Blue, consistent with Amigo's fiduciary, contractual, and regulatory duties;

    b. Alternatively, requiring Amigo to cause the transfer of all Clear Blue-owned premiums held in all bank accounts in the care, custody, or control of Amigo, its officers, or any of its agents to a court-authorized neutral trust account, pending final resolution;

    c. Enjoining Amigo from transferring or otherwise withdrawing any additional Clear Blue-owned premiums from the trust accounts to any location or recipient other than to Clear Blue;

    d. Requiring Amigo to remit to Clear Blue all premiums received directly or indirectly from policyholders relating to the contract between Amigo and Clear Blue, within thirty days of receipt; and

    e. Requiring Amigo to perform an accounting of all policyholder-paid premiums owed to Clear Blue.

3. That the Court enter a Permanent Injunction against Defendant Amigo, including any person or entity acting on behalf of or in concert with Defendant, ordering the same relief requested above on a permanent basis.

4. That the Court award Clear Blue any such other and further relief as the Court may deem just and proper.

Dated this 3rd day of June, 2020.				Respectfully submitted,

					By:	/s/ Mark A. Nebrig
						Mark A. Nebrig
						N.C. State Bar 28710
						Fielding E. Huseth
						N.C. State Bar 53121
						Raquel A. Macgregor
						N.C. State Bar 54905
						MOORE & VAN ALLEN PLLC
						100 N. Tryon Street, Suite 4700
						Charlotte, NC 28202
						Telephone: (704) 331-1000
						Facsimile: (704) 331-1159
						marknebrig@mvalaw.com
						fieldinghuseth@mvalaw.com
						raquelmacgregor@mvalaw.com

						*Attorneys for Plaintiff*

## **VERIFICATION**

I, Peter Klope, pursuant to the requirements of 28 U.S.C. § 1746, being first duly sworn, depose and say that I am a duly authorized representative of Plaintiff Clear Blue Insurance Company, that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true and correct to the best of my knowledge, except as to those matters and things alleged upon information and belief, and, as to those things, I believe them to be true.

_____
Peter Klope, Chief Operating Officer
Clear Blue Insurance Company

Signed and sworn to before me this
\_\_\_\_\_day of June, 2020

_____
Notary Public
My commission expires:_____

19

Case 3:20-cv-00312-GCM   Document 1   Filed 06/03/20   Page 19 of 20

## VERIFICATION

I, Peter Klope, pursuant to the requirements of 28 U.S.C. § 1746, being first duly sworn, depose and say that I am a duly authorized representative of Plaintiff Clear Blue Insurance Company, that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true and correct to the best of my knowledge, except as to those matters and things alleged upon information and belief, and, as to those things, I believe them to be true.

_____
Peter Klope, Chief Operating Officer
Clear Blue Insurance Company

Affidavit # 682

Signed and sworn to before me this
__3__ day of June, 2020

_____
Notary Public
My commission expires: _Indefinitely_

Signed before me by Peter Klope, of legal age, married, resident of Guaynabo, Puerto Rico. To me personally known.